The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons have an in-man or full of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attendance for the Court is now sitting. God save the United States from the fall of the Court. Mr. Lumpkin, you may begin. Good morning. May it please the Court, the administration, faculty, and students of the University of Maryland. My name is Hugh Lumpkin and along with Megan Moore of Verbloom & Lumpkin and Alan Ruley of Bell Davis and Winston-Salem, we represent the appellants across Appellees here. This is an appeal largely from post-trial orders that stilled the jury's voice in an action tried in Columbia, South Carolina. The jury had awarded substantial amounts of compensatory and punitive damages, which were ultimately set aside, principally in the order of August 10, 2012. These awards were based upon the manner in which Liberty Mutual processed five construction defect cases, ultimately settling those cases, each and every one of them, over the vigorous objections of the insured. The cases are the Avian, Moray, Riverwalk, Magnolia, and Tillman cases, and the jury found that Liberty had settled and adjusted four of the five cases in breach of the Covenant of Good Faith and Fair Dealing, and imposed that Liberty had imposed excessive claim handling charges amounting to about $18,000, the total represented in excess of $684,000 in compensatory damage. The jury separately found, and this was an itemized verdict, that Liberty Mutual was entitled to recover approximately $900,000 in deductible obligations that MI had failed to pay, but then after being separately charged, and we had a separate argument on the issue, the jury also found that Liberty Mutual would be required to pay, because of its conduct and behavior, $12.5 million in punitive damages. Both sides, of course, filed post-trial motions. The August 2010 order is the one that vacated the compensatory award in favor of MI Windows. It did, however, find that the evidence of the breach of the Covenant of Good Faith and Fair Dealing was sufficiently sound and profound to sustain that finding. The court essentially found that nothing Liberty Mutual did, however, caused, if you will, the compensatory award in favor of MI, and that was set aside. The court then recharacterized the $18,000 in excessive claim handling charges as contractual damages. The court further found that $210,000 of the amount that Liberty Mutual was seeking was improperly allocated under South Carolina law by Liberty Mutual. I think we are reasonably clear about the procedural history. Fair enough. It is a complex record, to be sure, but I'm really curious to know, you've got a number of issues here, and I was anxious to know what you wanted to talk about first. In that case, I'll get right to the issues, Your Honor. Thank you for that. The issues, there are a number of them, to put it mildly, and while the shiny object here is justly the $12.5 million punitive damage award, I think that's something that the district court, in all fairness, should be able to pass on, should she have the opportunity on remand. The issues I'd like to talk about, frankly, are the waiver issue, the issue of whether or not the damages for bad faith were properly set aside by the district court, given the abundant evidence that Liberty Mutual had not done what it needed to do to discharge its obligations of good faith and fair dealing, and whether or not attorney's fees can be seen under South Carolina law as an element of damages. Well, if you'll permit me to jump over waiver for just a moment, I really think waiver is really well covered in the breeze. The question, though, of proximate causation, you argue, as I understand it, in part, that the district court sort of misled you by what I think is fairly characterized as a rather conclusory denial of summary judgment to Liberty Mutual. But then she seemed to take a different view of things at the JNOV stage. What do you say about that? If the court please, I have to completely agree with what you said. I think that, and I'll be very temperate in the way I put this, the March 30, 2010 order, which is what you were referring to, plainly denied Liberty Mutual's motion for summary judgment. And was that correct? Yes, it was correct. And it was correct because the measure of damages to MI are the deductible obligations that were created by Liberty settling these cases in breach of the covenant. And how can that be? If you were going to be on the hook for up to $500,000, potentially at least, for defense costs and an alternative potential settlement, how can it be that the measure of damages is simply the settlement amounts? The measure of damages represents the settlement amounts. Remember the order in which the cases were resolved. Avian Forest was resolved first. And that, as you know from the record, was discussed by defense counsel as being the best case to take to trial. At trial, he said it was a 50-50 chance of defense verdict. But if you take into consideration the fact that MI, and the jury was entitled to find this to be true, that MI was going to win that case, then in that event, any money that was expended either in defense costs or indemnity thereafter as an obligation imposed on MI under the deductible obligations would have been imposed in breach of the covenant of good faith and fair dealing. I'm not sure I know what you mean by thereafter. Well, Bray was the next case to settle. That was the one where they had a reserve of $50,000, and the case settled for $500,000. Okay, so you're talking about the seriatim potential trials of the five cases. No doubt about it. No doubt about it. I think there's a lot of doubt about it. To say that you've got a 50-50 chance of winning a case says there's a 50% chance that you'll lose the case. How can there not be doubt? And my client, MI, was willing to put its money where its mouth was. It was willing to pay to take these cases to trial and, in fact, said as much at trial. So in light of what you just said, is it your submission that even if MI were willing to pay the entire half million, to take the case to trial, let's assume for the sake of discussion that you had absolute proof of that, that they were willing to do that, but then Liberty Mutual settles the case for $250,000. Is it your submission that you're entitled to damages in that situation? Absolutely, Your Honor. Even if Liberty Mutual were to prove, not to suggest that the burden is on Liberty Mutual, but even if the insurer were to prove that, in fact, you would have lost that trial or that there's a 52% chance that you would have lost that trial? Those very questions bring you to cases like Barton where those were the exact facts that the jury had to consider, including how much the deductible obligation was, how much defense costs might be to take those cases to trial, MI Window's willingness to pay those defense costs, not only because it was its contractual obligation, because it told Liberty, we will pay to take these cases to trial, and the fact that these are cases that Liberty Mutual itself found to be very defensible. Its total reserves were $475,000. But Liberty Mutual tendered back the defense and the indemnity obligation on the case. Your client wouldn't accept that. That's true. How can you have it both ways? How can you say, we're willing to pay up to $500,000 and roll the dice at trial, but then if we lose, if there's a $1.5 million damage or a joint and several verdict against all the defendants, we may be on the hook for an amount in excess of coverage. Your argument is that Liberty Mutual had no choice but to take the case to trial under those circumstances. In fact, I had written down here that is not our argument at all. Our argument is that there were other options available to Liberty Mutual as the fiduciary actor here that would not have put Liberty in the position of saying, okay, uncle, we're taking these cases to trial, and if, in fact, a judgment for $8 million is rendered, we'll cut the check. That is not the option that Liberty Mutual was facing. It was not a Hobson's choice at all. It had the option of going to my client, and this is very common. In fact, there's a case out of South Carolina called Smith v. Maryland Casualty where this happened, where Liberty Mutual could have said to the client, we're willing to settle Avian for $72,300, and we'll honor that obligation. You take the case to trial. If the verdict is more, it's on you. They had that option. There's already that obligation. There's a contractual obligation here with the insurance contract itself, and you've already assumed that risk when there's a settlement which is completely in Liberty's discretion, and it is within the $500,000 deductible amount, then you've assumed that risk when you contracted with Liberty in the first place. We assumed the risk that we would be dealt with fairly and honestly and with due regard for our interests. Bear in mind that there were also special service instructions here that required discussion before Liberty Mutual did anything to impair the right of MI to protect its product reputation and take these cases to trial. Bear in mind also, as Justice Souter has said when he was on the Justice in the New Hampshire Supreme Court, the more discretion a party has, the more that discretion has to be exercised in good faith and fairly. It is like Peter Parker in Spider-Man. Absolute power, he has to dispense it carefully. I understand your argument, Counselor, but we can't rewrite contracts. Insurance companies make actuarial assessments in terms of premium. Basically what you're telling me is you wanted a policy that says, if we have reputation to protect, we want you to try these cases, period, no matter what may be the efficacy of settling them or not, right? That's not what your contract said. The contract said Liberty Mutual had the right to settle them. You should have had a contract that said, no, we'll sue, you will defend us, and we will pay our deductible, but you will defend it. That's not what your contract said. Thank you for that, Judge Gregory. A couple of things you've said resonate here. The first is, yes, Liberty Mutual did an actuarial assessment, and as you well know from this record, that assessment was that they would never have to pay a claim within their working layer. That was the basis of the bargain internally at Liberty Mutual. That was part of the motive for why they did what they did here. The second thing to bear in mind, this is not a deems expedient clause. This is a discretion clause, and courts, including this one, are fully familiar with a standard of review called an abusive discretion. Discretion has to be exercised fairly and honestly, and what the jury considered here was abundant evidence that it was not done. We would not be here complaining if Liberty had honored its bargain. It did not. This is a breach of an implied contract, and frankly— But if they had settled the case for $2, they would have not pleased you, because you still had your reputation to be concerned about, correct? Actually, Mr. Gary, when he was testifying, spoke to that, and he spoke to the fact that nominal settlements are something that MI does, $5,000 to $10,000. In fact, that is more derriere, if you will, in this type of business when someone complains that their window is leaking. It's usually a minor adjustment. So for $10,000, you would have foregone defending your reputation and this floodgate of suits against you, because that's what you said was at stake by settling this case. And it has happened. What you are dealing with, as you know, Judge, plaintiffs follow the money. If they have to work up a case, and the brass ring at the end of the day is $5,000 to $10,000, they won't do it. If, on the other hand, they get to do a per-window calculation, as they did in Riverwalk, when they took the amount of money that was paid to settle Avian Forest and multiplied it by 1,800 window openings, that's worth going after. And that's the difference between painting a target on the back of an American company and settling cases for nuisance value. And that's why we say they breached the covenant of good faith and fair dealing. They didn't consider their insurance interests one way here. What's your best authority under South Carolina case law for the proposition that a commercial general liability policy has as one of its purposes the protection of the reputation of the insured? I thought insurance was about pecuniary laws, and the insurer's duty was to, as best as possible, mitigate pecuniary laws. But much of your argument seems to rest, as Judge Gregory suggested a moment ago, on this notion that you were entitled to have your insurer protect your reputation. I'm not sure I see that in South Carolina law. It depends. Well, if you look at the Tadlock decision, which is the closest factual analog, where the insurance company insisted that there was a proclaimed deductible, it turned out it was right at one summary judgment in the district court. The court nonetheless found, and it worked its way up to this court eventually, by the way, that there was a breach, or at least an alleged breach, of the covenant of good faith and fair dealing because the manner in which the claim was processed led the poor fellow that did the overspray painting in that case to settle the cases with his own funds. The fact of the matter is there are policies that are sold in the market today, principally professional liability policies, that are designed to protect people's reputations. I think we all know that. They have a consent to settle clause in them. And you didn't? No, we don't have a consent, but... Whoops, I'm so sorry. I'm trying to... the old trial law is crawling out. There's no consent to settle clause here. However, there is an at-hour discretion clause. They could have bargained for a deems expedient clause, but they didn't sell it. They sold a discretionary clause. Discretion is something that implies that someone in the position of Liberty Mutual would heed the fact that the harm to an insured is more than just pecuniary. You can't just dump them by the roadside and walk away when you're done with them, which is what they did here. What are we to make of the fact that the case that did go to trial, co-defendants get a multimillion-dollar verdict again? Well, there's two sides to that coin, and I think that you know that. There was a rather sharp disagreement concerning what the record reflected on the one case that went to trial where MI was on the verdict form, by the way. And for one thing, MI wasn't there to defend its product. It had already settled. So it's in the nature of a default finding. But in the one case where it was on the verdict form involving Heritage, it was exonerated. What happened there is that MI received a summary judgment in its favor, and then after it was out of the case, and that's the summary judgment that's referred to in the record, the case went to trial so that the vicarious liability for the defect in the window could be tried, and MI was exonerated. So there's two sides. You know, I'm really curious about that. You won summary judgment. Yeah. But you say the claim against you was still on the verdict form? It was. Although we were no longer a party in the case, the question that the jury had to answer was whether or not the developer in that case had to answer for window leaks allegedly caused by defects in the windows because it had a vicarious responsibility that was not resolved by the summary judgment granted in favor of MI. So are you saying that the plaintiff in that case and the developer both tried to prove liability on the part of your client, and the jury didn't buy it? The plaintiff in that case did. Obviously, the developer had every interest in finding that the window had no defects. So the developer defended your client. And, well, they should have. And so your client won the case twice. I like that. At summary judgment and in front of the jury. And it would be very nice if we could win this one here today, too. I'm going to reserve the rest of my time, what may be left, for rebuttal if you don't mind. All right. Thank you, Mr. Lumpkin.  Excuse me, Mr. Brown. Thank you, Your Honor. Your Honor, may it please the Court, Mitch Brown for Liberty Mutual of Wausau. There are five reasons that the amended judgment should be affirmed, except that prejudgment interest and taxable costs should be added, in our view. One, public policy favors settlements. This is not just a statement. This is actually codified in South Carolina law. In the Improper Claims Act statute, there's a provision that requires, for example, failing to adopt and implement reasonable standards for prompt investigation and settlement of a claim is against the law in South Carolina. So you have to not only develop but implement steps to promptly settle claims. Further, the Trotter v. State Farm case makes it clear that Liberty is under a duty to settle a case where it might expose its insurer to an excess verdict. So we have that duty to settle again. So that's point one. Point two, as the Court's already mentioned, the unchallenged law of the case here is that the District Court found that the contractual arrangement between the parties granted liberty and not, in my windows, the right to settle these cases. And it says not only right but duty to settle the cases. Here's my conundrum. Yes, sir. The District Court said, on the one hand, that the jury's finding of liability was sound. The District Court didn't touch that. Furthermore, the District Court had said back at summary judgment, there's a genuine dispute of material fact as to damages. The case is tried. I understand your instructional error point, but apart from that, the jury found in favor of the plaintiff. Actually, the counter-plaintiff. And then the Court said, well, after all, after further reflection, actually they got to show, the counter-plaintiffs got to show, that there was some incremental increase in their pecuniary injury above and beyond the mere settlement amount. Now, arguably, the District Court could have said that back at summary judgment. And one of the questions I have for you is why didn't the District Court say that back at summary judgment? Why did it? Because the standards are exactly the same. Summary judgment? Yes, sir. Judgment at the close of the plaintiff's case? J-N-O-V? The standards are exactly the same at all three stages. And it seemed to have, the wisdom came late, which, of course, we prefer that it come late than that it not come at all. Right. But the judge finally said, well, there's got to be something here beyond the mere settlement amount. Yes, sir. So your submission is the judge got it wrong at summary judgment and the judge got it right at J-N-O-V. That's right. And the judge also – I guess my bottom line question is why shouldn't we send this back for a new trial in light of that rather unorthodox procedural posture of the case? We obviously are arguing for affirmance of the amended judgment. But if there is a new trial, then we would like that jury charge corrected, Your Honor. Understood. But speaking to the so-called trapping or misleading of the summary judgment ruling, it's simply a denial of summary judgment. That is, while it is the same standard, Your Honor points out, it's a different point in time procedurally in the case than the directed verdict and then the subsequent J-N-O-V where the totality of the trial has now occurred, counsel has had every opportunity to put in whatever evidence they want to, and the court then rules on those other motions. But we're only talking about a very discreet, indeed one might say insular issue, the measure of damages. Right. That didn't change. The law didn't change. The facts didn't change between summary judgment and J-N-O-V. Well, let me point out that in the opening statement, and this is in our brief, in the opening statement counsel for M.I. Windows made the comment that he would come in and prove, and he actually made the comment again just a moment ago, that he did prove, which I have to beg the difference of agreement on this, that M.I. Windows was going to win all these trials. Okay? And he said, we'll show you that M.I. Windows will win the trials for the same cost as it costs to settle the cases. And that's, so he understood what his ultimate causative burden was going to be, and he didn't meet that burden. He just did not prove that. There was absolutely no way that you can take this record and say, yeah, it would be a fair inference that M.I. proved that they were going to win all these cases. But why isn't that the necessary inference to be drawn from the jury verdict? Why is it not the necessary inference? Yeah. The jury seemed to have bought that argument. I don't, Your Honor, I don't know that they, there were a number of arguments about various bad faith and claims processing made throughout the trial. Who knows which one of those the jury latched onto. But we do know they punctuated their conclusion with $12 million. Yes, Your Honor. I understand that. Well, Your Honor, we don't, again, we're speculating, Mr. We're speculating? We're speculating as to what the jury, why they awarded that $12.5 million. In fact, there wasn't even a number suggested by counsel. Did you ask for a special verdict in terms of they would lay it out? No. Okay. That's why probably they did it that way. That's right. Let me ask you this question. Yes. You thought Riverwalk was worth nothing. I think. Zero reserve. Your Honor, he's talking about the reserve. The reserves, okay, the reserves, I'd like to explain our view of the reserves. They are point in time pieces of information. They are not, and they ebb and flow. The testimony was very clear that they change. In fact, there was testimony that the Riverwalk reserve changed from a zero to match the settlement amount, ultimately, later in the case. So, at what point in the record can we find that change from zero to match the settlement amount? Is it just the mere fact of settlement? No, Your Honor. Julian Savoy testified to that. I don't have the particular joint appendix page number, but I read that. I remember reading that, Your Honor. The timing was the same? The settlement came about the same time you made the change? That reserve had changed at that point. You don't need to change the reserve. You don't need it. You know that. Well, I understand, Your Honor. There was another thing going on with Riverwalk, which was that Riverwalk and Magnolia North were settled as a package deal. It was the same plaintiff's lawyer involved. And there's another piece of information in the joint appendix about do we need to set any separate reserve for Riverwalk since we're settling these together? So, there's that going on as well about Riverwalk. It's very unusual in a case like Riverwalk, where multimillion-dollar exposure was stated to exist by defense counsel, underlying defense counsel, that you would have zero down for reserve. But that would be the explanation I would give, Your Honor, for that. Now, in Avian Forest, to further explain the reserve situation,  the case settled for $72,500, or $73,500. Avian Forest is a good example of just where this M.I. Windows is trying to take this court, which we would strongly urge you to resist. Avian Forest is a case where the case was settled for less than the expected defense cost to take the case through trial. Nevertheless, M.I. Windows comes in and they say this. They say, Liberty, even though you had the contractual right to settle the case, it's bad faith for you not to let us spend another $24,000 to get it to trial and then that you give us the opportunity to exonerate our product and dodge this $7 million exposure. That's their bad faith position. And, Your Honor, we're not going to settle many cases in South Carolina if you've got that type of situation. They say it's the heads I win, tails you lose dilemma. That actually prompted, ironically, the Tiger River doctrine. Did anybody consider at trial or leading up to trial the desirability or the necessity to have a special jury verdict, have interrogatories? Because, frankly, I mean, I suspect you'll agree that to a significant extent, this case involves five separate bad faith claims, right? Yes, Your Honor. Did the court reject that approach or did nobody suggest it? Your Honor, I'm not sure of the answer to that. I wasn't at trial counsel. I apologize for not knowing the answer to that particular question. No, that's all right. I would like to answer one of Your Honor's questions that you gave to opposing counsel about reputation and whether insurance contracts protect reputation in South Carolina. They don't. In fact, the Doe case that's been cited, that very issue was brought up where the doctor was saying, my reputation's at issue. That's a Med-Mal case. Right. Don't settle the case. My reputation's at issue. And the court said, look, we're not going to get into that. Two cases provide, and this is the third reason why the amended judgment ought to be affirmed, two cases I would draw the court's attention to show and give guidance to the court on what to do with this case. The Gardner case from this court, the Fourth Circuit case, and that was the Gardner v. Aetna case sent in by supplemental citation, and the Doe case, which was discussed at length. In both cases, there are two interesting points that the courts make note of, and they say there's no bad faith as a matter of law as a result of these two points. One, that everyone was in agreement that jury trial could not be avoided. Okay, that was the first point. If they looked at the underlying case, they said there was no way to avoid a jury trial. And two, there was evidence that the defendant was, in fact, wrong in what they had done, negligent or done something wrong. You've got both of those here in abundance in this case, in all of the underlying cases. You've got everybody, even Mr. Gary, in my window's hired lawyer, said it was reasonably possible that there would be an adverse verdict in all of the cases. So this is your objective reasonableness point. Well, let me talk about the objective reasonableness. That's what you were just talking about, isn't it?  What's the difference between objective reasonableness? Here's the difference. Our position is that the, and this is another way to answer your Honor's earlier question about what the district court did or didn't do. Our position is the district court applied the wrong standard, not the correct South Carolina standard on what is and what is not bad faith. And that's our additional sustaining ground we raise in our brief. What the district court did, and this is important to distinguish, it said is there any evidence that it was not objectively reasonable to settle these cases for X amount of money? And she then tried to point to some things and said, well, here's some evidence. I think that maybe they settled these cases for too much money. That's not the standard. The standard that she should have looked to was, did Liberty have any reasonable basis to do what it did? I thought that's exactly how she instructed the jury. The quotation from her instructions in the JNOV order, I thought was extraordinarily favorable to your perspective. Your Honor, she did in fact make that statement in the jury instructions. But what she didn't do was in the JNOV, she didn't apply that standard. Because had she applied it, I would submit to you. But the jury did. She instructed the jury on objective reasonableness. And as I read the instruction, I mean, essentially she told the jury that the jury had to find no objective basis for the settlement. Which seems to be, frankly, far more favorable to you than the law, a more nuanced instruction might have suggested. Because every insurer is going to have an objective basis. I mean, any insurer who settles cases without an objective basis won't be in business very long. Right. So there will always be an objective basis. I thought the question really comes down to the kind of notion, does the evidence of bad faith and bad faith claims handling and bad faith settlement overcome the evidence of objective good faith, of objective reasonableness? Well, Your Honor, our position is that with the JNOV ruling, she should have looked at the record and she should have made the determination as a matter of law, no reasonable jury would have had information to reject or to say that in my windows proved there was no reasonable basis. And she said exactly the opposite. She said the opposite. She said, I'm not going to touch this liability fine. That's right. And that was an error. That's what we're saying is that was an error, Your Honor. She also said, and this is the last reason why the amended judgment should be affirmed, is there weren't any proved causative damages, which, of course, we agree with. I don't mean this to be an unfair question, but when are the last three times this court reversed a district judge's ruling on a JNOV? I hope it's not very often. I don't think it's very often. I mean, the judge is there. The judge sees the witnesses. The judge hears the witnesses. The judge instructs the jury. The trial judge has a far better grasp of what's going on in that trial. Well, as I say, we agree with her ruling about the no causative damages, and that would solve the problem in any event. Well, see, I'm not sure it does. That's the problem. We've got this conflict. We've got a very distinguished, very experienced trial judge telling us, on liability, solid, solid. You can pick apart the evidence if you want, and that's appropriate, certainly. But the judge who was there said, clearly, this jury acted reasonably in finding that Liberty Mutual went off the rails here, to use that longstanding legal term. But then she says, but there are no damages. So we have this conflict, and I'm just not sure how we resolve that conflict as an appellate court. She also let Liberty Mutual's contract damages stand. Right. And the reason she did, and properly did, is because in order to show unclean hands or anything like that, to avoid those claims, you have to show some prejudice. And they never approved damages or prejudice. Well, I mean, your verdict is just a set-off. I mean, in terms of the way the jury handled this and was instructed to, it's just a set-off. I mean, you won a three-quarter million dollar verdict, but it was just a set-off against what the jury giveth and the jury taketh away from your claim. Right. Your Honor, the way we look at it is the jury looked at a breach of contract case, and they ruled for us. Then our position is that the other side didn't prove either bad faith or damages with their bad faith claim. And the jury, nevertheless, ruled for them. That was not a good ruling, and the judge recognized that. So what was the basis of the jury's erroneous verdict, in your opinion? Your Honor, I can't speculate except there were some inflammatory things. Well, you've got to speculate. You've got to point to something. Well, I'll point out that there were some inflammatory things said by witnesses here and there throughout the trial that might have animated this jury. But those aren't raised on appeal. Those aren't raised on appeal, Your Honor. I'm doing what Your Honor asked me to, and I'm speculating, why did the jury do this? One of the witnesses said something to the effect of, you know, I'm playing poker. I hate insurance companies. I'm playing poker. And then he retracted it like the next page, which wasn't pointed out. He said, I shouldn't have said playing poker. That was not a good idea. But comments like that is the only thing I can point to, Your Honor, is to say, why did this jury? I mean, frankly, trial counsel has sat with me and tried to figure out, why did the jury do this? We can't figure it out. Well, trial counsel chose the jury. Well, I guess they were stuck with selecting what they had. But, Your Honor, we would agree that with the trial judges amended judgment, except we do believe prejudgment interest ought to be added to the judgment. I reserve any further time I have, Your Honor. Thank you. All right. Thank you. Mr. Lunkin, do you have some more time? Thank goodness. If the court please, first I'm going to fix the confusion regarding reserves. I've studied insurance for 30 years, so I have some knowledge of this. Reserve is adjusted at the moment of settlement. If the reserve is not equal to the amount of settlement, it is set at the amount that's going to be paid in settlement at the moment of settlement, so the check can be cut. A check cannot be cut unless the reserve amount and the check amount match because it's no longer a reserve or an estimate. It's a fixed number. And, yes, the avian reserve went to $300,000. That was just before trial. And that went to $300,000. That's what galvanized Darlene Moffitt to call Michael Schaaf, the we're playing poker witness, to find out what on earth was going on and why Liberty was going to be settling. So reserves are, as the evidence is clear on this through Mr. Julian Savoy, the very accurate estimate of what the insurance company believes a case will settle for, and it has to be for the reasons that Mr. Savoy expressed. If they over-reserve, it carried out as a liability on the books by the insurance company, and it affects their ability to be profitable. Is there any tweaking of that practice when you have an insured who has a deductible as large as your client's deductible was? Yeah. I'm just curious. There it is. And the way it's tweaked. The reserve sort of didn't matter in this case. I don't mean to suggest it had no evidentiary value, but it didn't matter as a practical matter, did it? As a practical matter, it does matter to the insured because if you have a large deductible. To the insured. To the insured. That's why they have the ability to see what reserves are being set, because if a reserve is set too high, that has collateral consequences. MI, for example, has to collateralize the reserves with a letter of credit. I see. So they have to be pretty darn accurate, and that's why the reserves were the basis, by the way, for the jury's award of damages. The collateral was already collateralized at the time the policy issued. That's not true? It's annually adjusted. It's annually adjusted, but if you post a reserve and increase it dramatically during the year, the insurance company has the ability to go in and say, we're not secure, we need more collateral, and that's why the insured has a say in that. As far as the jury, how it handled this by itemized verdict, it actually happened in the middle of trial that the jury asked a question. Actually, it was right during the deliberations. They wrote a note and said, are we to consider this as one big mess, or are we to consider these as five separate cases? Five small messes. Yes. And how did the judge answer the question? We actually conferred trial counsel for Liberty Mutuals here as well and decided that that made perfect sense, that these are five separate bad faith actions. Why didn't the verdict sheet reflect that? It did, to a degree, because if you look at the number of compensatory damages awarded, it was exactly the amount that Liberty Mutual was seeking, less the Murray case of $210,000 that was misallocated by Liberty Mutual. That's the breach of contract claim. What about the bad faith? That's exactly what the jury did on its bad faith damages. It awarded as damages the amount Liberty Mutual paid in settlement on four of the five cases, and that's how it arrived at its quantum of damages. So I guess you're conceding, and I think you did in the brief, that as to one of the cases, the jury actually found you were damaged by the settlement amount, even though you conceded that the defense costs, had you gone to trial, would have exceeded the settlement amount. We have to concede that in the brief. And so how can that be compensable damage? How can it be compensable to your client, for your client to pay, round numbers, $75,000, instead of, round numbers, $250,000? How can the jury say, reasonably, you've been injured to the tune of $75,000? Because the jury very reasonably could have considered that we would have paid X dollars to take the case to trial, which we were willing to pay and had offered to pay. But the settlement amount exceeded, and in four of the cases it did, the amount it would have taken the case to trial. And that seems to go back to Judge Gregory's point. You wanted to be a self-insurer. We were. And yet you went out with all kinds of professional help, with a broker, and bought this policy. So you were sort of walking on both sides of the street, weren't you? No, not at all. You wanted to be treated as if you were a self-insurer, and yet you got the premium benefit of a couple of million dollars of coverage at a low cost. The problem here is that when they settled these cases, Liberty Mutual treated us like we were self-insured, and that's the problem. You put your finger on it. Last thing, I made a mistake when I got up here earlier and answered a question about the Heritage case. I just checked the trial transcript. What happened was the builder was a party in the case. When we won summary judgment, the builder refused to drop his cross-claim against MI. So when the case went to trial, MI was still on the verdict form because of the builder's cross-claim. And so the builder was trying to prove the claim against your client, not your client. Exactly right. And I apologize for that. Thank you. Thank you, Mr. Duncan. Mr. Brown? Thank you, Mayor. Please, the Court. On the reserve issue, I would point out that there was evidence in the record that Darlene Moffitt, who was the person in charge of the risk management program at MI Windows, would call on occasion and complain about the amount of the reserves and say, this is costing us too much money. This is tying up too much of our money in line of credit. Will you please move it down some? Things like that. The reason I bring that up is it just shows the disconnect between the reserve and the things that go into the reserve. And trying to take that and draw an inference that if it doesn't match up with the settlement paid at any given time, that somehow means something. It really doesn't, Your Honor. Secondly, the point that Your Honor raised about the program purchased by MI Windows, they in fact did purchase from Zurich a subsequent insurance program that gave them the right to settle. That's not the bargain they entered into with us, which is why we're here and have all these issues before the Court. We were put into a place where if we didn't settle the cases, the law said we could be sued for bad faith if an excess verdict came down. And then MI said, yeah, but if you settle the cases, we're going to sue you for bad faith as well. What about the option that Mr. Lumpkin said you had? The only option that was put in evidence, Your Honor, in the record was they offered to come in and prove to pay. They said we will pay for our own defense, but we will not allow you to not pay for any excess judgment. And that's not how it works. Nothing you suggested could have been proactive and suggested a way they could have protected their reputation and you could have protected yourself as well. Your Honor, there wasn't an option like that. Liberty Mutual actually said if you want to completely self-insure in front of the excess layer and just get us out of this, you could do that in the avian forest matter, but they didn't want to do that. They wanted to try the case for their money, but if something really bad happened, we would be stuck paying the bill. Thank you, Your Honor. Thank you so much. We'll come down to Greek Council and proceed to our next case.
judges: Roger L. Gregory, Andre M. Davis, Stephanie D. Thacker